IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

MARLA CRAWFORD,                    )
                                   )
            Plaintiff,             )
                                   )
v.                                 )        Civil Action No. 3:11CV430–HEH
                                   )
DEPARTMENT OF                      )
CORRECTIONAL EDUCATION             )
                                   )
            Defendant.             )

MEMORANDUM OPINION
(Granting Defendant's Motion to Dismiss)

This is an action for damages and other relief under the American with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ; and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e. It is presently before the Court on Defendant's Motion to Dismiss and pursuant to 28 U.S.C. § 1915. The Court will dispense with oral argument because it would not materially aid in the decisional process. For the reasons set forth herein, the Motion will be granted.

## I. BACKGROUND

Marla Crawford ("Plaintiff") is proceeding *pro se* and *in forma pauperis* in this matter. Her Complaint consists of a scattershot chronology of events spanning from October 2008 through July 2010. The Court assumes Plaintiff's well-pleaded allegations to be true, and views all facts in the light most favorable to her. *See Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). Plaintiff appears to allege as follows.

Plaintiff is the former Director of Math and Science Curriculum and Instruction for the youth schools of the Virginia Department of Correctional Education ("DCE"). She was apparently employed in this capacity from approximately July 2008 through May 2009.[1] Plaintiff also alleges that she is "a head injury patient" who "use[s] a machine at night because [she] lose[s] oxygen." (Pl.'s Compl. ¶ 2.)

On July 10, 2008, Plaintiff informed the Acting Deputy Superintendent of DCE, Harold Lawson ("Lawson"), of her disability. (*Id.* at ¶ 12.)[2] In light of Plaintiff's medical issues and her location on the eighteenth floor, Lawson agreed to provide Plaintiff with special accommodations in case of a building evacuation. Notwithstanding Plaintiff's medical restrictions, however, Lawson assigned Plaintiff to work from a SMART Box on November 11, 2008, which required her to "haul[] books from central office . . . ." (*Id.* at ¶ 4.) Plaintiff alleges that she "physically crash[ed]" within a week, and had to take three days off from work. (*Id.*) Soon thereafter, her physician wrote a note excusing her from work and stating that she needed a task chair with good lumbar support and adjustable arm rests. Plaintiff contends that the DCE office manager never responded to the request, and thus Plaintiff sometimes "had to slide down in [her] chair

---

[1] Plaintiff alleges that she was employed by DCE on July 8, 2009. Although she does not specifically allege that she was employed by the DCE prior to that date, the bulk of her allegations relate to events that purportedly occurred between October 2008 and her termination in May 2009. (*See* Pl.'s Compl. ¶¶ 3–29.) It appears that Plaintiff's reference to July 2009 is a typographical error. Given Plaintiff's *pro se* status and the procedural posture of the case, the Court assumes without deciding that Plaintiff was employed by DCE in 2008.

[2] In the second paragraph of her Complaint, Plaintiff alleges that she informed Lawson of her disability in July 2009. Considering her subsequent allegations, and giving Plaintiff every benefit of the doubt, the Court assumes that Lawson learned of Plaintiff's medical issues in 2008.

because of . . . fatigue and place the computer keyboard partially on [her] chest and desk to work." (*Id.* at ¶ 5.)

Starting in early February 2009, Plaintiff learned "that the mandated instructional time to teach a full year science curriculum was not in place." (*Id.* at ¶ 6.) Perceiving this as a shortcoming in the DCE program, Plaintiff e-mailed Lawson to express her concerns and offer possible solutions. Shortly thereafter, Plaintiff "began having problems on the job." (*Id.* at ¶ 7.) Prior to this time, however, Lawson had "supported [her] initiatives for improving the academics and teacher quality." (*Id.*)

A few days later, Plaintiff met with her supervisor, Jacqueline Nelson ("Nelson"), and Lawson. Nelson and Lawson advised Plaintiff of a change in the learning programs for the DCE youth schools. Shortly thereafter, Plaintiff was asked to put copies of the existing Curriculum Guides in the youth schools' libraries. Because she thought doing so would amount to copyright infringement, Plaintiff refused to comply with the request. She expressed her copyright concerns to Lawson, who shared her unease. As a result, on February 16, 2009, Plaintiff was assigned to develop a new Curriculum Guide with a fellow DCE employee, Dr. McCabe. The Guide was to be completed by April 1, 2009. Plaintiff alleges that it "was impossible" to develop the Guide within the allotted time. (*Id.* at ¶ 10.)

During an evacuation of the building on February 25, 2009, Nelson allegedly "removed [Plaintiff's] building evacuation accommodations." (*Id.* at 11.) Specifically, Plaintiff claims that Nelson told her to take the stairs because the "elevators were not working." (*Id.*) As she exited the building, however, Plaintiff "noticed ... [a] Caucasian

male … at the elevators." (*Id.*) Plaintiff walked down thirty-two flights of stairs, which caused her to become weak and lightheaded. As a result, she had to leave work and use her oxygen machine for four hours.

Two days later, Plaintiff advised that she was unable to work for medical reasons. Lawson allegedly responded that he did not know about her medical disability, and asked her to provide supporting documentation to Human Resources ("HR"). Plaintiff's doctor faxed to DCE a statement concerning Plaintiff's physical limitations. Plaintiff subsequently learned that her request for a task chair had been denied.

In March 2009, Plaintiff's "problems on the job" led her to seek support through the Employees Assistance Program. (*Id.* at ¶ 18.) She felt that she "was targeted for professional failure," and that Lawson and Nelson were making work at DCE "difficult." (*Id.*) More precisely, Plaintiff complained that after she sent an e-mail to Lawson complaining about "school scheduling," DCE no longer permitted her to provide free lunch and snacks to teachers. (*Id.* at ¶¶ 18-19.)

On March 17, 2009, Plaintiff received a negative performance evaluation. The review, signed by both Lawson and Nelson, was based on (1) instructional time and Plaintiff's related complaints; (2) a presentation about PACE Learning that Plaintiff set up for the Assistant Superintendent of the adult schools; and (3) Plaintiff's decision to stamp "All Rights Reserved" and her initials on the Curriculum Guide she helped develop. (*Id.* at ¶ 19.)

The following week, Plaintiff was moved to a larger office. Plaintiff complained that her new desk did not have a docking station or mouse for her laptop computer,

forcing her to use her fingers to move the cursor on the laptop. DCE employee Sheri Johnson allegedly gave Plaintiff a mouse, which someone later removed while Plaintiff was using the restroom. Another DCE employee subsequently tried to find a mouse for Plaintiff to use. Starting in April, Plaintiff decided to bring her own laptop and mouse from home "because the computer screen and keyboard was larger than on the State issued laptop computer." (*Id.* at ¶ 20-21.)

At a staff meeting on April 1, 2009, Plaintiff expressed concern that she did not have enough time to complete the curriculum development task assigned to her. Consequently, she was given a new deadline of May 1, 2009. (*Id.* at ¶ 22.) On April 20, 2009, Plaintiff received a letter from HR Director Robert Gunn ("Gunn") concerning Plaintiff's failure to research test questions. Four days later, Plaintiff submitted most of the assigned Curriculum Guides to Nelson and Lawson, and forwarded the same to Gunn. As of that date, Plaintiff had not yet completed Curriculum Guides for at least three subjects, but submitted an additional two such Guides on May 1. (*Id.* at ¶¶ 25-27.)

On April 27, Plaintiff requested a meeting with Gunn, which was allegedly scheduled for May 4, 2009. Plaintiff believes that someone from HR informed Lawson of her request to meet with Gunn. On May 1, 2009, two hours after Plaintiff submitted her remaining Curriculum Guides, Lawson allegedly gave Plaintiff a Letter of Termination dated April 28, 2009. (*Id.* at ¶ 28.) Dr. McCabe, who was Caucasian and "always being reprimanded," was not terminated. (*Id.*)

Based on the foregoing, Plaintiff lodged a complaint against DCE with the U.S. Equal Employment Opportunity Commission (EEOC). On March 3, 2011, the EEOC

mailed Plaintiff a "right-to-sue" notice, which Plaintiff purportedly received on April 4, 2011. Pursuant thereto, Plaintiff filed suit in this Court on July 5, 2011. On July 21, this Court granted Plaintiff's motion for leave to proceed *in forma pauperis*. Defendant filed the present Motion on September 8, 2011, and Plaintiff responded. The matter is now ripe for disposition.

## II. STANDARD OF REVIEW

The federal *in forma pauperis* statute, 28 U.S.C. § 1915, grants indigent plaintiffs the privilege of commencing an action in federal court without prepaying administrative costs. To prevent abuse of this privilege, however, the Court must dismiss a complaint filed *in forma pauperis* if the complaint fails to state a claim for which relief can be granted. 28 U.S.C. § 1915(e)(2)(B)(ii); *Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 656 (4th Cir. 2006).

The standards for dismissal under § 1915(e)(2)(B)(ii) and Federal Rule of Civil Procedure 12(b)(6) are the same. *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003). To state a claim for relief, the plaintiff's complaint must contain (1) a short and plain statement of the grounds for the court's jurisdiction, (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for the relief sought. Fed. R. Civ. P. 8(a). The purpose for requiring a short and plain statement of the claim is to provide the defendant "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The complaint need not provide "detailed factual allegations," but it must contain "more than labels and conclusions" or a

6

"formulaic recitation of the elements of a cause of action." *Id.* The plaintiff's factual

allegations "must be enough to raise a right to relief above the speculative level." *Id.*

*Pro se* complaints are afforded a liberal construction. *Laber v. Harvey*, 438 F.3d

404, 413 n.3 (4th Cir. 2006). However, the court need not attempt "to discern the

unexpressed intent of the plaintiff." *Id.* As Judge Wilkinson noted in *Beaudett v. City of

Hampton*, "[t]hough [*pro se*] litigants cannot, of course, be expected to frame legal issues

with the clarity and precision ideally evident in the work of those trained in law, neither

can district courts be required to conjure up and decide issues never fairly presented to

them." 775 F.2d 1274, 1276 (4th Cir. 1985). Thus, "[t]he special judicial solicitude with

which a district court should view ... *pro se* complaints does not transform the court into

an advocate," and "[o]nly those questions which are squarely presented ... may be

properly addressed." *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir. 1990).

### III. ANALYSIS

Plaintiff claims that DCE discriminated against her on the basis of her disability,

in violation of Titles I and III of the ADA, as well as the Rehabilitation Act. She further

alleges racial discrimination and retaliation in violation of Title VII. The Court addresses

these claims in turn.

*A.*

The ADA "forbids discrimination against persons with disabilities in three major

areas of public life: employment, which is covered by Title I of the statute; public

services, programs, and activities, which are the subject of Title II; and public

accommodations, which are covered by Title III." *Tennessee v. Lane*, 541 U.S. 509, 516-

17 (2004). "Public accommodations" include places such as hotels, restaurants, auditoriums, and amusement parks. 42 U.S.C. § 12181(7). Although Title III may also include "place[s] of education," *id.* § 12181(7)(J), it "expressly does not apply to public entities," including state and local governments. *Bloom v. Bexar Cnty.*, 130 F.3d 722, 726 (5th Cir. 1997). Because DCE is an agency of the Commonwealth of Virginia, Title III is inapplicable to the case at bar.

Turning next to Plaintiff's Title I claim, the ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). An employer who fails to make "reasonable accommodations" for a disabled employee "discriminate[s] ... on the basis of disability" within the meaning of § 12112(a), unless the accommodation would impose "an undue hardship" on the employer. *Id.* § 12112(b)(5)(A). "Reasonable accommodations" include "making existing facilities used by employees readily accessible to and usable by individuals with disabilities," and "acqui[ring] or modif[ying] . . . equipment or devices." *Id.* § 12111(9).

Defendant argues that the Eleventh Amendment bars Plaintiff's claim for both damages and injunctive relief under Title I. The "ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001). As the Supreme Court has explained, however, a suit against the State may nonetheless

8

proceed if Congress abrogates the States' sovereign immunity; the State consents to be sued; or if the suit "alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Va. Office for Protection & Advocacy v. Stewart*, 131 S. Ct. 1632, 1638-39 (2011) (discussing the "*Ex Parte Young* doctrine") (internal quotations and citation omitted).

In passing the ADA, "Congress did not validly abrogate the States' sovereign immunity from suit by private individuals for money damages under Title I" of the Act. *Garrett*, 531 U.S at 374 n.9. Nor did the Commonwealth of Virginia consent to be sued under Title I. Contrary to Plaintiff's assertions, "the mere fact that a State participates in a program through which the Federal Government provides assistance for the operation by the State of a system of public aid is not sufficient to establish consent on the part of the State to be sued in the federal courts." *Edelman v. Jordan*, 415 U.S. 651, 673 (1974). Accordingly, Plaintiff's action cannot proceed insofar as it seeks to recover money damages. The remaining question, therefore, is whether the present suit can fairly be characterized as one "for prospective injunctive or declaratory relief designed to remedy ongoing violations of federal law." *Bragg v. West Va. Coal Ass'n*, 248 F.3d 275, 292 (4th Cir. 2001).

"In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit [against a State], a court need only conduct a straightforward inquiry into whether [the] complaint alleges an *ongoing* violation of federal law and seeks relief properly characterized as *prospective*." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quotation marks and citation omitted)

9

(emphasis added).  On its face, Plaintiff's Complaint in this case does not allege any such ongoing violation of federal law.  Plaintiff's Title I claim arises from the purported failure of her employer to provide her with a task chair and to consistently provide emergency evacuation accommodations.  That is, Plaintiff does not claim wrongful termination; rather, she alleges unlawful treatment *during her tenure as a DCE employee*.  Since that employment has now ended, Plaintiff does not "allege[] an ongoing violation of federal law," and does not "seek[] relief properly characterized as prospective."  *Id.*

Moreover, as Plaintiff does not contest the propriety of her discharge,[3] the equitable relief she seeks—reinstatement of her employment—lacks a sufficient nexus to her alleged harm.  District courts are powerless to impose injunctive relief that exceeds "the nature and extent of the ... violation" in question.  *Ostergren v. Cuccinelli*, 615 F.3d 263, 288-89 (4th Cir. 2010) (quoting *Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 420 (1977)); *see also Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 14 (1st Cir. 2000) ("Injunctions must be tailored to the specific harm to be prevented.").  Likewise, even if Plaintiff could prove a violation of Title I, an order directing Defendant to accommodate Plaintiff's disability in her already-terminated employment would be futile.  Therefore, Plaintiff's claim under Title I of the ADA will be dismissed.

*B.*

Defendant correctly contends that Plaintiff's claim pursuant to § 504 of the Rehabilitation Act is time-barred.  As the Rehabilitation Act does not include its own

---

[3] Pl.'s Resp. 3 ("Wrongful termination is **NOT** an issue raised in the said COMPLAINT.") (emphasis in original).

limitations period, 42 U.S.C. § 1988(a) requires the Court to apply the most analogous common-law statute of limitations. *See Wolsky v. Med. Coll. of Hampton Rds.*, 1 F.3d 222, 223 (4th Cir. 1993). Accordingly, Plaintiff's claim in this case is governed by the limitations period of the Virginia Rights of Persons with Disabilities Act, Va. Code §§ 51.5-40, *et seq. Id.* Under that statute, a plaintiff must initiate her lawsuit within one year of the alleged discriminatory act's occurrence.

Plaintiff's Complaint asserts that her employment at DCE concluded on May 1, 2009. No ongoing violation of the Rehabilitation Act is alleged to have persisted beyond that termination date. (*See* Pl.'s Resp. at 13 ("I agree that Defendant's conduct occurred prior to my … termination.").) As Plaintiff did not file suit until July 5, 2011—more than two years after Defendant's alleged misconduct ended—her Rehabilitation Act claim is time-barred.

### C.

Plaintiff also claims that Defendant discriminated and retaliated against her in violation of Title VII of the Civil Rights Act of 1964. The Court will assess her discrimination and retaliation claims separately.

### 1.

In order to establish a *prima facie* case of discrimination under Title VII, a plaintiff must either provide direct evidence of discriminatory intent, or satisfy the four-factor scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Wileman v. Frank*, 979 F.2d 30, 33 (4th Cir. 1992). Plaintiff's Complaint fails to set forth facts that would satisfy either of these standards.

11

First, Plaintiff does not allege facts that directly evidence discrimination. Where a plaintiff's complaint "merely tell[s] a story of a workplace dispute ... and some perhaps callous behavior by her superiors," it plainly "do[es] not describe the type of severe or pervasive ... race ... based activity necessary to state" a claim of discrimination under Title VII. *Bass v. E. I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003). Further, such shortcomings are not overcome by a plaintiff's conclusory allegations that her employer's conduct was motivated by racial animus. *See id.* In *Jordan v. Alternative Res. Corp.*, for example, the Fourth Circuit affirmed the dismissal of the plaintiff's Title VII claim because the facts alleged did not support his conclusory assertion that his race was a "motivating factor" for his discharge from employment. 458 F.3d 332, 345 (4th Cir. 2006). In the case at hand, Plaintiff's Complaint is similarly flawed.

Plaintiff alleges that a fellow DCE employee who was Caucasian was allowed to use the elevator during a building evacuation while she was forced to use the stairs. She concedes, however, that her HR file did not contain the disability paperwork required to secure an evacuation accommodation. Plaintiff further claims that a white employee also charged with developing the DCE curriculum was not terminated, even though "she was always being reprimanded." (Pl.'s Compl. at 11.) Plaintiff provides no further details concerning the events and individuals in question. Rather, Plaintiff asserts only bare racial labels and conclusory allegations of racial animus. Standing alone, the facts alleged do not reasonably support an inference that Defendant's actions towards Plaintiff were motivated by Plaintiff's race.

12

Having failed to allege facts that directly evidence discriminatory intent, Plaintiff must satisfy the *McDonnell Douglas* framework.  That is, Plaintiff must allege that (1) she is a member of a protected class; (2) she was qualified for her job and her job performance was satisfactory; (3) she suffered an adverse employment action; and (4) similarly situated employees not in the protected class received more favorable treatment. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-10 (1993).  Although plaintiffs are not required as a matter of law to point to a similarly situated comparator to prevail on a discrimination claim, *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 545 (4th Cir. 2003), a plaintiff who bases her allegations entirely upon a comparison to an employee from a non-protected class must demonstrate that the comparator was "similarly situated" in all relevant respects. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981) (internal citations omitted).  To do so, the plaintiff must show that the other employee "dealt with the same supervisor, ... [was] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).

In her Complaint, Plaintiff designates the race of other employees whom she claims were treated differently.  However, she does not allege facts from which the Court can reasonably deem those comparators to be similarly situated to Plaintiff.  First, as to the Caucasian male whose disability Defendant allegedly accommodated, Plaintiff alleges only that he apparently worked in the same physical building—nothing more.  She also contends that one Caucasian employee, Dr. McCabe, was also involved in developing

some elements of the DCE curriculum, but otherwise does not specify facts showing her to be similarly situated in all pertinent regards.  More significant to the Court's conclusion here, Plaintiff describes in detail her own disciplinary record at DCE, but does not attribute to her comparators a similar course of behavior.  Because Plaintiff does not identify a viable co-employee who might permit a reasonable determination as to disparate treatment, she is unable to satisfy the fourth factor of the *McDonnell Douglas* test.  Plaintiff's Complaint therefore fails to state a viable Title VII discrimination claim.

2.

To state a viable claim of retaliation under Title VII, a plaintiff must allege "that (1) [s]he engaged in protected activity; (2) [s]he suffered an adverse employment action at the hands of [her] employer; and (3) the employer took the adverse action because of the protected activity."  *Bryant*, 333 F.3d at 543 (quoting *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 190 (4th Cir. 2001)).  In this case, Plaintiff does not claim that she engaged in any form of "protected activity."  Her retaliation claim thus fails Rule 12(b)(6) muster.

Protected activities under Title VII are divided into two categories: (1) participation and (2) opposition.  42 U.S.C. § 2000e-3(a).  The participation clause of Title VII forbids retaliation against an employee who "has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under [Title VII]."  *Id.*  Similarly, the opposition clause forbids an employer from retaliating against an employee "because [the employee] has opposed any practice made an unlawful practice . . . under [Title VII]."  *Id.*

14

Plaintiff never claims that she was terminated for complaining of, or participating in a proceeding against, her employer's purportedly unlawful practices. In fact, Plaintiff does not allege in the first instance that she engaged in protected activity of any kind during the course of her employment at DCE. At no point does she assert that she communicated to her supervisors or coworkers any concerns about her being treated unfairly due to her race, color, religion, sex, or national origin—the categories protected under Title VII. *Id.* § 2000e-3(b) Indeed, the only "protected activity" in which Plaintiff has engaged to date is her *post*-termination initiation of this action with the EEOC. Logically, Plaintiff cannot claim that Defendant retaliated against her involvement in protected activity without first claiming to have engaged in some sort of prior protected activity. As a result, the Court must dismiss her Title VII retaliation claim.

## IV. CONCLUSION

For the reasons stated above, Defendant's Motion will be granted. The Court will dismiss with prejudice Plaintiff's claims under § 504 of the Rehabilitation Act and Titles I and III of the ADA. Plaintiff's Title VII discrimination and retaliation claims will be dismissed without prejudice.

An appropriate Order will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
United States District Judge

Date: Nov. 29, 2011
Richmond, VA